# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

**Glenda Barker and Cornelia Guthery,**

                    Plaintiffs,

     v.

**MERCK & CO. INC.,**

Serve:       Registered Agent
              The Corporation Company
              120 South Central Ave.
              Clayton, MO 63105

**PFIZER INC**

Serve:       Registered Agent
              CT Corporation
              120 S. Central
              Clayton, MO 63105

**PHARMACIA CORPORATION,**

Serve:       Registered Agent
              CT Corporation
              120 S. Central
              Clayton, MO 63105

**G.D. SEARLE LLC,**

Serve:       Registered Agent
              CT Corporation
              120 S. Central
              Clayton, MO 63105  .

Cause No.

**JURY TRIAL DEMANDED**

## COMPLAINT

COME NOW plaintiffs, and for their complaint against Merck & Co., Inc., G.D. Searle LLC, Pharmacia Corporation, and Pfizer Inc allege as follows:

1. This action is brought by plaintiffs, seeking damages for personal injuries and economic damages suffered as a result of a defective and dangerous pharmaceutical product, Vioxx, which was manufactured, marketed, distributed and/or sold by Merck & Co. Inc., and Celebrex (Celecoxib), which was manufactured, marketed, distributed and/or sold by G.D. Searle LLC, Pharmacia Corporation, and Pfizer Inc. This action seeks monetary damages for personal injuries, including damages caused by the drugs named herein and ingested by plaintiffs.

2. Glenda Barker is a citizen of the state of Oklahoma. Because of her use of Bextra and Vioxx, she suffered retinal vein occlusion and related injuries. Vioxx and Bextra caused or was a contributing cause of her health problems.

3. Cornelia Guthery is a citizen of the state of North Carolina. Because of her use of Bextra and Vioxx, she suffered a stroke and related injuries. Vioxx and Bextra caused or was a contributing cause of her health problems.

## JURISDICTION AND VENUE

4. There is federal subject matter jurisdiction based on diversity of citizenship because plaintiffs and defendant are citizens of different states and the amount-in-controversy requirement exceeds $75,000 for each plaintiffs' claim.

5. The applicable statute of limitations is tolled based on defendants' fraudulent concealment of the dangers and adverse side effects of the drugs Vioxx, respectively, from

480247 / 004128

2

plaintiffs as more fully stated herein.  Additionally, for the reasons stated herein, defendant

Merck is equitably estopped from raising the statute of limitations defense.

## PARTIES-VIOXX

6.  The Defendant, Merck & Co., Inc. (hereinafter "Merck" or "defendant Merck," is a

corporation organized and existing under the laws of the State of New Jersey, with its principal

place of business at One Merck Drive, White House Station, New Jersey 08889.

7.  At all times relevant hereto, Defendant Merck was engaged in the business of testing,

developing, manufacturing, distributing, licensing, labeling and marketing, either directly or

indirectly through third parties or related entities, the pharmaceutical drug, Vioxx throughout the

United States.

8.  As more particularly pleaded below, Plaintiff maintains that Vioxx is

defectively designed, inadequately tested, dangerous to human health, and lacked proper

warnings as to the dangers associated with its use.

## FACTUAL BACKGROUND-VIOXX

9.  Vioxx is the brand name of rofecoxib, one of a class of drugs called "prostaglandins,"

which work to reduce inflammation and pain by providing analgesic and anti-inflammatory

benefits to persons with, among other conditions, arthritis and muscle pain. Prostaglandins are

COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid to produce

prostaglandins.

10.  Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins at

inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet

aggregation.

11. Defendant Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

12. Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-052 by the FDA.

13. On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

14. At the time the drug was approved by the FDA the labeling for rofecoxib stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

15. The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects -- Risk of GI Ulceration, Bleeding, and Perforation."

16.  Defendant Merck submitted NDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the NDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

17.  The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

18.  In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did Merck do nothing to further accurately publish these studies, or warn consumers, but it denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge From COX-2 Trials*, in August 2000, page 3.

19.  Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment. Merck engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced Merck's financial stability to the detriment of its consumers. As a result

of Merck's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and appropriated approximately 23 percent share of the market.

20.  Merck continued to profit from its scheme by withholding information from Plaintiffs, the consuming public, and the health care industry. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

21.  On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing what had been concealed by Merck.  The study revealed that the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (defined in the article as myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) among Vioxx users in Merck's trials, including VIGOR, at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See* Mukhisjee, D., et al., *Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors*, J.A.M.A. 286:8, 954-959, Aug. 22/29, 2001.  In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

22.  In the JAMA study, the authors stated that by decreasing PGI2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PGI2,

potentially leading to an increase in thrombotic cardiovascular events. In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002. This is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2*, Journal of Science, V. 296:539-541, Apr. 19, 2002.

23. On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets."

24. The Warning Letter stated that Defendant Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

25.  The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant

Merck that supports the FDA's issuance of the Warning Letter, and makes the following

**"Conclusions and Requested Actions:"**

> The promotional activities and materials described above minimize
> the potentially serious Cardiovascular findings that were observed
> in the VIGOR study, minimize the Vioxx / Coumadin drug
> interaction, omit crucial risk information associated with Vioxx
> therapy, contain unsubstantiated comparative claims, and promote
> unapproved uses. On December 16, 1999, we also objected to your
> dissemination of promotional materials for Vioxx that
> misrepresented Vioxx's safety profile, contained unsubstantiated
> comparative claims, and lacked fair balance.
>
> Due to the seriousness of these violations, and the fact that your
> violative promotion of Vioxx has continued despite our prior
> written notification regarding similar violations, we request that
> you provide a detailed response to the issues raised in this Warning
> Letter on or before October 1, 2001.
>
> This response should contain an action plan that includes a
> comprehensive plan to disseminate corrective messages about the
> issues discussed in this letter to the audiences that received these
> misleading messages. This corrective action plan should also
> include:
>
> 1.    Immediately ceasing all violative promotional
>       activities, and the dissemination of violative
>       promotional materials for Vioxx.
>
> 2.    Issuing a "Dear Healthcare provider" letter
>       to correct false or misleading impressions
>       and information. This proposed letter should
>       be submitted to us for review prior to its
>       release. After agreement is reached on the
>       content and audience, the letter should be
>       disseminated by direct mail to all healthcare
>       providers who were, or may have been
>       exposed to the violative promotion.

      3.     A written statement of your intent to comply
with "1" and "2" above.

26. On April 11, 2002, the FDA approved a supplemental application for the use of

Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved

indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor"

letter, and a new patient package insert. The labeling and the "Dear Doctor" letter contained

information concerning the results of the VIGOR study.

27. The revised labeling further states that the administration of Vioxx 50 mg, was

associated with a higher incidence of gastrointestinal symptoms.

> **Clinical Studies in OA and RA with VIOXX 50 mg (Twice the highest
> dose recommended for chronic use)**
> In OA and RA clinical trials which contained VIOXX 12.5 or 25 mg as
> well as VIOXX 50 mg, VIOXX 50 mg QD was associated with a higher
> incidence of gastrointestinal symptoms (abdominal pain, epigastric pain,
> heartburn, nausea and vomiting), lower extremity edema, hypertension,
> serious* adverse experiences and discontinuation due to clinical
> adverse experiences compared to the recommended chronic doses of
> 12.5 and 25 mg (see DOSAGE AND ADMINISTRATION).

28. Further, the "Dear Doctor" letter, approved in conjunction with the revisions to the

Vioxx labeling, outlines the changes to the Vioxx labeling.

29. The revised "Patient Information" sheet does not add any information about the

results of the VIGOR study."

30. The "Patient Information" sheet is the only written document that is provided to a

patient for whom Vioxx is prescribed.

31. Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential cardiovascular and/or cardiothrombotic side effects of Vioxx.

32. Despite knowledge of the ineffectiveness of the warnings, and despite knowledge that Vioxx may cause serious cardiovascular and/or cardiothrombotic side effects, defendant Merck has concealed and/or downplayed the dangers associated with Vioxx, and continued to market the drug in the United States and abroad. In its 2001 Annual Report, for example, Defendant Merck states:

> The Company also noted that a number of federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to *Vioxx*. . . . The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are completely without merit and will vigorously defend them.

33. Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, Defendant fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, **VIOXX**, ZOCOR, COZAAR/HYZAAR*, FOSAMAX and SINGULAIR, drove Merck's performance for the year and created a powerful platform for growth." These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.
>
> "Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. **VIOXX**, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, **VIOXX** has become the world's fastest growing branded

prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, **VIOXX** now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States. **VIOXX** achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which **VIOXX** reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that **VIOXX** significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

34.  Despite the foregoing, Defendant Merck continued to represent to consumers that Vioxx was safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug, until Merck withdrew Vioxx from the market in September 2004. Merck also downplayed any potential gastrointestinal side effects of the drug, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

35.  Defendant Merck knew of the cardiothrombotic effects and increased risk of cardiovascular events caused by Vioxx use, yet failed to warn of these dangers to plaintiffs, its customers, healthcare providers or the public.

36.  Pursuant to prescriptions received from their treating physician, plaintiffs regularly purchased and ingested Vioxx for various periods of time. Plaintiffs now suffer from heart attacks, strokes, transient ischemic attacks ("TIAs"), coronary artery disease, althersclerosis, blood clots, and other diseases caused by the use of Vioxx.

37.  Vioxx is primarily prescribed to reduce pain from inflammation.  However, the defendants failed to conduct sufficient research in manufacturing and marketing Vioxx to determine the severity of the drugs' potential side effects.  Defendants also withheld adverse reports or gave incorrect information about such reports that they had received about side effects such as heart attacks and strokes.  As a result of defendants' failure and the undisclosed defects of Vioxx, plaintiffs have sustained heart attacks, strokes, TIAs, and other ill-effects.

38.  Defendant Merck & Company, Inc. is a New Jersey corporation with its principal place of business located in New Jersey.  Merck is engaged in the business of producing, marketing and distributing pharmaceutical products for sale to the general public and is the manufacturer of Rofecoxib, distributed under the brand-name Vioxx.  Merck conducts business, and at all times relevant hereto, it developed, manufactured and sold the pharmaceutical drug Vioxx.

## <u>COUNT I</u>

### <u>Strict Products Liability/Defective Design --<br>Against Merck</u>

Come now plaintiffs and for Count I of their complaint against defendant Merck allege:

39.  Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

40.  Defendant Merck designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Vioxx which it knew would be used by plaintiffs and others.

480247 / 004128

12

41.  At the time the Vioxx was manufactured and sold to plaintiffs by Merck, it was defective in design and unreasonably dangerous, subjecting users to risks of heart attacks, strokes, and other illnesses which exceeded the benefits of the products, and for which other safer products were available.

42.  Alternatively, when the Vioxx products were manufactured and sold to plaintiffs by defendant Merck, the products were defective in design and formulation, making use of the products more dangerous than other drugs for pain relief.

43.  The Vioxx sold to plaintiffs reached plaintiffs without substantial change.  Plaintiffs were unaware of the dangerousness of the products until after their use and the development of heart attack, strokes, transient ischemic accidents, blood clots, and other related illnesses. Plaintiffs ingested the Vioxx without making any changes or alterations.

44.  As a direct and proximate result of the defective and dangerous design of the Vioxx, plaintiffs have been damaged.

45.  Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

## COUNT II

### Strict Products Liability/Failure to Warn -- Against Merck

Come now plaintiffs and for Count II of their complaint against defendant Merck allege:

46.  Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

47.  The Vioxx manufactured and supplied by Merck was unaccompanied by proper and adequate warnings regarding all adverse side effects associated with the use of Vioxx, and the

13

comparative severity and duration of the adverse effects.  The warnings given by Merck did not accurately reflect the symptoms, type, scope or severity of the side effects.

48.  Merck failed to perform adequate testing and study of Vioxx prior to marketing it or properly analyze and warn based on its VIGOR study.  Such adequate testing, study or analysis of the VIGOR study would have shown that Vioxx possessed serious life threatening side effects, with respect to which full and proper warnings accurately and fully reflecting symptoms, type of illness, scope and severity should have been given with respect to the use of Vioxx.

49.  Merck also failed to act properly on adverse reports it received about Vioxx, and failed to properly study Vioxx pre-market as well as post market and analyze and follow up on its VIGOR study as well as other studies.

50.  Merck also failed to effectively warn users and physicians that numerous other methods of pain relievers, including Ibuprofen, Naproxen, and/or aspirin  were safer.

51.  Merck failed to give adequate post-marketing warnings or instructions for the use of Vioxx because after Merck knew or should have known of the risk of injury from Vioxx use, Merck failed to provide adequate warnings to users or consumers and continued to aggressively promote the product to doctors, hospitals, and directly to consumers.

52.  As a direct and proximate result of defendant Merck's failure to warn of the potentially severe side effects of the Vioxx products, as well as the other conduct mentioned in this Count, plaintiffs have been damaged.

53.  Merck's conduct was done with conscious disregard for the safety of the users of Vioxx, justifying an award of punitive damages.

## COUNT III

## Negligent Design--Against Merck

Come now plaintiffs and for Count III of their complaint against defendant Merck allege:

54. Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

55. Defendant Merck designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Vioxx which it knew would be used by plaintiffs and others.

56. At the time the Vioxx was manufactured and sold to plaintiffs by Merck, it was defective in design and unreasonably dangerous, subjecting users to risks of heart attacks, strokes, blood clots, and other illnesses which exceeded the benefits of the products, and for which other safer products were available.

57. Alternatively, when the Vioxx products were manufactured and sold to plaintiffs by defendant Merck, the products were defective in design and formulation, making use of the products more dangerous than other drugs for pain relief.

58. The Vioxx sold to plaintiffs reached plaintiffs without substantial change. Plaintiffs were unaware of the dangerousness of the products until after their use and the development of heart attacks, strokes, and other related illnesses. Plaintiffs ingested the Vioxx without making any changes or alterations.

59. In designing and testing Vioxx, Merck failed to exercise the ordinary care that a careful and prudent drug manufacturer would exercise in the same or similar circumstances.

60. As a direct and proximate result of the negligent design of Vioxx, plaintiffs have been damaged.

61. Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

<u>COUNT IV</u>

<u>Negligence, Failure to Warn--Against Defendant Merck</u>

Come now plaintiffs and for Count IV of their complaint against defendant Merck, allege:

62. Plaintiffs incorporate all allegations in the preceding paragraphs as is fully set forth in this Count.

63. Defendant Merck owed a duty to warn of any dangerous defects or side effects; a duty to assure their products did not cause users unreasonable and dangerous risks, reactions, and side effects; and a duty to provide adequate post market surveillance and warnings as it learned of Vioxx's substantial dangers.

64. Defendant Merck breached their duty of reasonable care to plaintiffs in that defendant Merck failed to:

a. Conduct sufficient testing which, if properly performed, would have shown that Vioxx had serious side effects, including heart attacks, strokes, hypertension, althersclorosis, blood clots, and other serious side effects, and warn users of those risks; and/or

b. Include adequate warnings with the Vioxx products that would alert users to the potential risks and serious side effects of the drugs; and/or

c. Warn plaintiffs that use of Vioxx carried a risk of death or permanent disability from heart attack, strokes, blood clots, other cardiovascular disorders and other serious side effects; and/or

16

d. Advise the FDA, the health care industry, and the public about the adverse

reports it had received regarding Vioxx; and/or

e. Other appropriate warnings.

65. Defendant Merck knew or should have known that Vioxx caused unreasonably

dangerous risks and serious side effects of which the general public would not be aware.

Defendant Merck nevertheless advertised, marketed and promoted their products knowing there

were safer methods and products for pain control.

66. As a direct and proximate result of defendant Merck's negligence and breaches of

their duty of reasonable care, plaintiffs have been damaged.

## COUNT V
### Negligent Misrepresentation–against defendant Merck

Come now plaintiffs and for Count V of their complaint against defendant Merck, allege:

67. Plaintiffs reallege the allegations in the preceding paragraphs as if fully set out

herein.

68. Defendant Merck misrepresented to plaintiffs and/or their treating physicians the

potential serious cardiovascular findings that were observed in the VIGOR study, minimized the

Vioxx/Coumadin drug interaction, omitted crucial risk information associated with Vioxx,

misrepresented Vioxx safety profile and represented that Vioxx was safe, and that any

cardiovascular and/or cardio thrombotic side effects were not associated with the drug.

69. These representations were made with the actual knowledge of Merck.

70. The representations set forth *supra* were material to plaintiffs and/or their treating

physicians to prescribe and maintain plaintiffs' prescription of Vioxx.

71.  The representations were made either without knowing of the truth or falsity of the representations or defendant Merck knew or should have known that the representations being made were false and, therefore, defendant Merck failed to exercise reasonable care in making the representations in the scope and course of their employment in marketing Vioxx to individual consumers, plaintiffs' treating physicians, hospitals, and other health care providers.

72.  The defendant Merck intended for plaintiffs and/or their treating physicians to rely upon the material misrepresentations to induce them to initially prescribe Vioxx and continue plaintiffs on Vioxx.

73.  Plaintiffs justifiably relied on the representations which were made directly to them or made to their treating physicians, with defendant Merck knowing that plaintiffs were in a limited group who defendant Merck knew would rely upon the information.

74.  As a direct result of defendant Merck's negligent misrepresentation, plaintiffs were injured.  The negligent misrepresentations caused or contributed to cause plaintiffs' damages.

## COUNT VI

### Fraudulent Omission/Concealment–against defendant Merck

Come now plaintiffs and for Count VI of their complaint against defendant Merck allege:

75.  Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

76.  Defendant Merck had actual knowledge of the cardiothrombotic effects of Vioxx. Despite having knowledge of the cardiothrombotic effects of Vioxx, Defendant Merck engaged in a pattern and conduct of actively concealing and omitting to disclose those effects when

marketing Vioxx to doctors, health care providers, and to the general public for direct

advertisements.

77. At the time these omissions were made, defendant Merck had knowledge of the

substantial and significant cardiothrombotic effects of Vioxx.

78. Defendant Merck omitted to inform plaintiffs of the true cardiothrombotic and other

adverse health effects of Vioxx. They further downplayed the results of various studies showing

the cardiothrombotic effects and explaining the cardiothrombotic effects of Vioxx as set forth in

the VIGOR study;  they withheld adverse reports or gave incorrect information about the reports

they received about the side effects of Vioxx such as heart attacks and strokes.  They further

instructed and had a training manual for their sales force to dodge and mislead doctors when they

asked questions about the cardiothrombotic effects of Vioxx.

79. Defendant Merck failure to disclose material facts constituted fraudulent

concealment.

80. Defendant Merck, itself and by and through its agents, had a duty to speak because

they had superior knowledge regarding the adverse health effects of Vioxx as set forth herein.

81. The information not disclosed by defendant Merck was unavailable to plaintiffs

and/or their treating health care professionals.  Defendant Merck knew the information was

unavailable yet approved and participated in instructing their agents, servants and employees not

to disclose this information in order to promote the sales of Vioxx over other Cox 2 inhibitors as

well as any non-steroidal anti-inflammatory such as Ibuprofen, Naproxin, and/or aspirin.

82. Plaintiffs were diligent in attempting to seek the information by consulting with their

physicians.

83.  The information not disclosed by defendant Merck was not within the reasonable reach of plaintiffs and/or their treating physicians and was not discoverable by plaintiffs and/or their treating physicians in the exercise of reasonable care.

84.  The non-disclosed information was material, defendant Merck knew they were not disclosing complete information and intended that plaintiffs and/or their treating physicians act upon the non-disclosed information in the manner reasonably contemplated.

85.  Plaintiffs and/or their treating physicians were ignorant as to the undisclosed information and had a right to rely on full disclosure.

86.  If plaintiffs and/or their treating physicians had known the complete information, they would not have prescribed and/or plaintiffs would not have taken Vioxx as evidenced by Merck withdrawing it from the market in September 2004.

87.  Defendant Merck's non-disclosure of information was outrageous due to their evil motive or reckless indifference to the rights of plaintiffs, justifying an award of punitive damages.

## COUNT VII

## BREACH OF IMPLIED WARRANTY-VIOXX

Come now plaintiffs and for Count VII of their complaint against defendant Merck allege:

88. Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if set forth at length herein.

89. When Merck placed the Vioxx into the stream of commerce, Merck knew of the use for which the supplement was intended and impliedly warranted to consumers

including Plaintiffs that the use of Vioxx was a safe and acceptable means of relieving

pain and impliedly warranted that the product was of merchantable quality and safe for its

intended use.

90. Plaintiffs relied upon Merck and its judgment when they purchased and utilized

Vioxx.

91. The Vioxx was not of merchantable quality and was not safe or fit for its

intended use because it was unreasonably dangerous and incapable of satisfying the

ordinary purpose for which it was intended, and because it caused serious injury to

Plaintiffs.

92. As a direct and proximate result of the dangerous and defective condition of

the Vioxx, plaintiffs were injured, including incurring economic damage in the form of medical

expenses.

93. Plaintiffs are entitled to recover from Merck for all damages caused by the

defective product including, but not limited to, damages for pain, suffering, mental

anguish, emotional distress, loss of the capacity to enjoy life, lost past and future

income and incurred expense.

## COUNT VIII

## BREACH OF EXPRESS WARRANTY-VIOXX

Come now plaintiffs and for Count VIII of their complaint against defendant Merck

allege:

94. Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if

set forth at length herein.

95. At all relevant times, Merck expressly warranted to Plaintiffs by statements made by Merck or its authorized agents, orally or in written publications, package labels, and/or inserts, that the Vioxx was safe, effective, fit, and proper for its intended use. The express warranties include, but were not limited to:

96. Vioxx is used in adults for:

a. relief of the pain and inflammation (swelling and soreness) of osteoarthritis (arthritis from wear and tear on your bones and your joints);

b. relief of the pain and inflammation of rheumatoid arthritis in adults (arthritis caused by a condition where your immune system attacks your joints);

c. management of short-term pain;

d. treatment of menstrual pain (pain during women's monthly periods);

e. treatment of migraine headache attacks with or without aura

97. In utilizing Vioxx, Plaintiffs relied upon the skill, judgment, representations, and express warranties of Merck.

98. The express warranties and representations made by Merck were false in that Vioxx was not safe and was not fit for the use for which it was intended.

99. As a direct and proximate result of the dangerous and defective condition of Vioxx, plaintiffs were damaged, including incurring economic damages in the form of medical expense.

100. Plaintiffs are entitled to recover from Merck for all damages caused by the

defective product including, but not limited to, damages for pain, suffering, mental anguish, emotional distress, loss of the capacity to enjoy life, lost past and future income and incurred expense.

## PARTIES--BEXTRA

88.    Defendant Pfizer Inc (hereinafter "Pfizer") is a Delaware corporation, and Pfizer was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Bextra.

89.    Defendant G.D. Searle LLC  (hereinafter "Searle") is an Illinois Corporation that was in the business of designing, manufacturing, marketing, selling and distributing the pharmaceutical product Bextra.

90.    Defendant Pharmacia is a Delaware Corporation.  Defendant Pharmacia was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Bextra.

91.    Bextra (Valdecoxib) is a pharmaceutical treatment for musculoskeletal joint pain associated with osteoarthritis, among other maladies.  Pfizer, Pharmacia, Searle manufactured, designed, packaged, marketed and distributed this drug.  Pfizer, Pharmacia, , and Searle encouraged the improper use of this drug, misrepresented the safety and effectiveness of this drug, and concealed or understated its dangerous side effects.  Pfizer, Pharmacia, and Searle aggressively marketed this drug directly to the consuming public, although only available through prescription, through the use of various marketing mediums, including, but not limited to, print and television advertisements. Pfizer, Pharmacia, and Searle did this to increase sales and profits.

92.     Pfizer, Pharmacia, , and Searle actually knew of the defective nature of their product as herein set forth, yet continued to design, manufacture, market, distribute and sell their product so as to maximize sales and profits at the expense of the general public's health and safety in conscious disregard of the foreseeable harm caused by this product.  Pfizer, Pharmacia, , and Searle's conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, ill will, recklessness, gross negligence or willful and intentional disregard to the Plaintiffs's individual rights, and hence punitive damages are appropriate.

## BACKGROUND-BEXTRA

93.     Bextra (Valdecoxib) is a pharmaceutical treatment for musculoskeletal joint pain associated with osteoarthritis, among other maladies.  Pfizer, Pharmacia, , and Searle did manufacture, design, package, market and distribute this drug.

94.     This petition seeks redress for damages sustained by plaintiffs, resulting from plaintiffs' use of Bextra (Valdecoxib), manufactured and sold by Pfizer, Pharmacia, , and Searle.

95.     The damages sought herein are the direct and proximate result of Pfizer, Pharmacia, , and Searle's wrongful conduct in connection with designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the prescription drug Bextra (Valdecoxib).

96.     Pfizer, Pharmacia, , and Searle were engaged in the business of designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the pharmaceutical drug Bextra (Valdecoxib) throughout the United States.

## COUNT IX

## STRICT PRODUCTS LIABILITY/ DEFECTIVE DESIGN

Come now plaintiffs and for Count IX of her Complaint against defendants Pfizer,

Pharmacia, , and Searle, allege:

97.  Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if fully set

forth herein.

98.  Pfizer, Pharmacia, , and Searle designed, produced, manufactured and injected into

the stream of commerce, in the regular course of its business, the pharmaceutical drug Bextra

(Valdecoxib) which it knew would be used by plaintiffs and others.

99.  At the time Bextra (Valdecoxib) was manufactured and sold to plaintiffs

by Pfizer, Pharmacia, , and Searle, it was defective in design and unreasonably dangerous,

subjecting users to risks of heart attacks, strokes, and other illnesses which exceeded the benefits

of the products, and for which other safer products were available. This defective condition made

the product unreasonably dangerous when put to a reasonably anticipated use as

treatment for pain relief, which was the use for which Bextra (Valdecoxib) was advertised.

100.   Alternatively, when the Bextra (Valdecoxib) products were manufactured and

sold to plaintiffs by Pfizer, Pharmacia, , and Searle, the products were defective in design and

formulation, making use of the product more dangerous than other drugs for pain relief.

101.  Plaintiffs used Bextra (Valdecoxib) in a manner reasonably anticipated.

102.  The Bextra (Valdecoxib) sold to the plaintiffs reached the plaintiffs without

substantial change. Plaintiffs were unaware of the dangerous propensities of the product.  The

plaintiffs ingested the Bextra (Valdecoxib) without making any changes or alterations.

103.    As a direct and proximate result of the defective and dangerous design of the Bextra (Valdecoxib), Plaintiffs has been damaged.

104.    Pfizer, Pharmacia, , and Searle's conduct was done with conscious disregard for the safety of users of Bextra (Valdecoxib), including plaintiffs, justifying an award of punitive damages.

## COUNT X

## STRICT PRODUCTS LIABILITY/FAILURE TO WARN

Come now plaintiffs and for Count X of her Complaint against defendants  Pfizer, Pharmacia, , and Searle and allege:

105.  Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if fully set forth herein.

106.    The Bextra (Valdecoxib) manufactured, supplied, and sold by Pfizer, Pharmacia, , and Searle was unaccompanied by proper and adequate warnings regarding all adverse side effects associated with the use of Bextra (Valdecoxib) and the comparative severity and duration of the adverse effects as well as that it was not approved for relief of acute pain and that it did not have any approved gastrointestinal-protective benefit.  The warnings given by Pfizer, Pharmacia, , and Searle did not accurately reflect the symptoms, type, scope, or severity of the side effects.

107.    The Bextra (Valdecoxib) manufactured, supplied, and sold by Pfizer, Pharmacia, , and Searle was an unreasonably dangerous defective product which posed unacceptable risks to human health when put to a reasonably anticipated use by Plaintiffs who were without knowledge of its dangerous characteristics.

108.    Pfizer, Pharmacia, , and Searle failed to perform adequate testing and study of Bextra (Valdecoxib) prior to marketing it or ignored existing data.  Such adequate testing, study or analysis would have shown that Bextra (Valdecoxib) possessed serious life threatening side effects, with respect to which full and proper warnings accurately and fully reflecting symptoms, type of illness, scope and severity should have been given with respect to the use of Bextra (Valdecoxib).

109.    Pfizer, Pharmacia, , and Searle also failed to act properly on adverse event reports it received about Bextra (Valdecoxib) and failed to properly study Bextra (Valdecoxib) – pre-market as well as post market.

110.    Pfizer, Pharmacia, , and Searle also failed to effectively warn users and physicians that numerous other methods of safer pain relievers were available.

111.    Pfizer, Pharmacia, , and Searle failed to give adequate pre- and post-marketing warnings or instructions for the use of Bextra (Valdecoxib) because after Pfizer, Pharmacia, , and Searle knew or should have known of the risk of injury from Bextra (Valdecoxib) use, Pfizer, Pharmacia, , and Searle failed to provide adequate warnings to users or consumers and continued to aggressively promote the product to doctors, hospitals, and directly to consumers.

112.    Plaintiffs used Bextra (Valdecoxib) in a manner reasonably anticipated.

113.    As a direct and proximate result of Pfizer, Pharmacia, , and Searle selling Bextra (Valdecoxib) without adequate warnings, as well as the other conduct mentioned in this Count, plaintiffs have been damaged.

114.    Pfizer, Pharmacia, , and Searle's conduct was done with conscious disregard for safety, justifying an award of punitive damages.

480247 / 004128

27

# COUNT XI

## NEGLIGENT DESIGN

Come now plaintiffs and for Count XI of her Complaint against defendants Pfizer, Pharmacia, , and Searle, allege:

115.    Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if fully set forth herein.

116.    Pfizer, Pharmacia, , and Searle designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Bextra (Valdecoxib) which it knew would be used by Plaintiffs and others.

117.    At the time the Bextra (Valdecoxib) was manufactured and sold to Plaintiffs by Pfizer, Pharmacia, , and Searle, it was defective in design and unreasonably dangerous, subjecting users to risks of heart attacks, strokes, blood clots, and other illnesses which exceeded the benefits of the product, and for which other safer products were available.

118.    Alternatively, when the Bextra (Valdecoxib) product was manufactured and sold to the Plaintiffs by Pfizer, Pharmacia, , and Searle, the product was defective in design and formulation, making use of the product more dangerous than other drugs for pain relief.

119.    The Bextra (Valdecoxib) sold to Plaintiffs reached the Plaintiffs without substantial change. Plaintiffs were unaware of the dangerous propensities of the product. Plaintiffs ingested the Bextra (Valdecoxib) without making any changes or alterations.

120.    In designing and manufacturing Bextra (Valdecoxib), Pfizer, Pharmacia, , and Searle failed to exercise the ordinary care that a careful and prudent drug manufacturer would exercise in the same or similar circumstances.

121.    As a direct and proximate result of the negligent design of Bextra (Valdecoxib), Plaintiffs have been damaged.

122.    Pfizer, Pharmacia, , and Searle's conduct was done with conscious disregard for the safety of users of Bextra (Valdecoxib), including Plaintiffs.

**COUNT XII**

**NEGLIGENT FAILURE TO WARN**

Come now plaintiffs and for Count XIV of her Complaint against defendants Pfizer, Pharmacia, , and Searle, allege:

123.  Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if fully set forth herein.

124.    Pfizer, Pharmacia, , and Searle owed Plaintiffs a duty to warn of any dangerous defects or side effects; a duty to assure its product did not cause users unreasonable and dangerous risks, reactions, side effects; and a duty to provide adequate post market surveillance and warnings as it learned of Bextra (Valdecoxib)'s substantial dangers.

125.    Pfizer, Pharmacia, , and Searle breached its duty of reasonable care to Plaintiffs in that Pfizer, Pharmacia, , and Searle failed to:

a.    Conduct sufficient testing which, if properly performed, would have shown that Bextra (Valdecoxib) had serious side effects, including heart attacks, strokes, hypertension, atherosclerosis, blood clots, and other serious side effects, and warn users of those risks; and/or

b.      Include adequate warnings with Bextra (Valdecoxib) that would alert users

to the potential risks and serious side effects the drugs as well as the limited

benefits and the approved uses; and/or

c.      Warn the Plaintiffs that use of Bextra (Valdecoxib) carried a risk of

death or permanent disability from heart attacks, strokes, blood clots, other

cardiovascular disorders and other serious side effects; and/or

d.      Advise the FDA, the health care industry, and the public about the

adverse reports it had received regarding Bextra (Valdecoxib); and/or

e.      Provide Plaintiffs with other appropriate warnings, including

but not limited to that Bextra is not approved for acute pain, it had no proven

gastrointestinal-protective effects, it should not be used indefinitely, and patients

had to be adequately screened prior to taking Bextra.

126.    Pfizer, Pharmacia, , and Searle should have known that Bextra (Valdecoxib)

caused unreasonably dangerous risks and serious side effects of which the general public would

not be aware.  Pfizer, Pharmacia, , and Searle nevertheless advertised, marketed and promoted its

product knowing there were safer methods and products for pain control.

127.    As a direct and proximate result of Pfizer, Pharmacia, , and Searle's negligence

and breach of its duty of reasonable care, Plaintiffs have been damaged.

## COUNT XIII

## FRAUDULENT CONCEALMENT

Come now plaintiffs and for Count XIII of his Complaint against defendants Pfizer,

Pharmacia, , and Searle, allege:

128.   Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if fully set forth herein.

129.   Pfizer, Pharmacia, , and Searle had actual knowledge of the cardiothrombotic effects of Bextra (Valdecoxib).  Despite having knowledge of the cardiothrombotic effects of Bextra (Valdecoxib), Pfizer, Pharmacia, , and Searle actively concealed and omitted to disclose those effects when marketing Bextra (Valdecoxib) to doctors, health care providers, and to the general public through direct advertisements.

130.   At the time these omissions were made, Pfizer, Pharmacia, , and Searle had knowledge of the substantial and significant cardiothrombotic effects of Bextra (Valdecoxib).

131.   Pfizer, Pharmacia, , and Searle omitted to inform Plaintiffs of the true cardiothrombotic and other adverse health effects of Bextra (Valdecoxib).  Pfizer, Pharmacia, , and Searle further downplayed the results of various studies showing the cardiothrombotic effects; it withheld adverse reports or gave incorrect information about the reports it received about the side effects of Bextra (Valdecoxib) such as heart attacks and strokes.

132.   Pfizer, Pharmacia, , and Searle's failure to disclose material facts constituted fraudulent concealment.  Pfizer, Pharmacia, , and Searle sanctioned approved and/or participated in the failure to disclose.

133.   Pfizer, Pharmacia, , and Searle had a duty to speak because they had superior knowledge regarding the adverse health effects of Bextra (Valdecoxib) as set forth herein.

134.   The information not disclosed by Pfizer, Pharmacia, , and Searle was unavailable to Plaintiffs and/or her treating health care professionals.  Pfizer, Pharmacia, , and Searle knew the information was unavailable yet approved and participated in instructing its agents, servants

and employees to not disclose the information in order to promote the sales of Bextra (Valdecoxib) over other Cox 2 inhibitors as well as any non-steroidal anti-inflammatory such as Ibuprofen and Naproxen.

135.    Plaintiffs were diligent in attempting to seek the information by consulting with his physicians.

136.    The information not disclosed by Pfizer, Pharmacia, , and Searle was not within the reasonable reach of plaintiffs, and/or her treating physicians, in the exercise of reasonable care.

137.    The non-disclosed information was material, and Pfizer, Pharmacia, , and Searle knew they were not disclosing complete information and intended that plaintiffs and/or her treating physicians act upon the non-disclosed information in the manner reasonably contemplated.

138.    Plaintiffs and/or her treating physician were ignorant as to the undisclosed information and had a right to rely on full disclosure.

139.    If plaintiffs and/or her treating physicians had known the complete information, they would not have prescribed and/or plaintiffs would not have taken Bextra (Valdecoxib) as evidenced by Pfizer, Pharmacia, , and Searle being required to include a black label warning.

140.    Pfizer, Pharmacia, , and Searle's non-disclosure of information was outrageous due to their evil motive and reckless indifference to the rights of plaintiffs, justifying and award of punitive damages.

**COUNT XIV**

## COMMON LAW FRAUD

Come now plaintiffs and for Count XIV of her Complaint against defendants Pfizer, Pharmacia, , and Searle and allege:

141.     Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if fully set forth herein.

142.     Pfizer, Pharmacia, , and Searle made false representations and omissions to plaintiffs and other members of the public, including but not limited to, that Bextra (Valdecoxib) was safe, had been adequately tested to determine safety, and did not present life-threatening dangers.

143.     These representations and omissions, as set forth in the above paragraphs, were false.  The true facts were that Bextra (Valdecoxib) was not safe, had not been adequately tested, and had dangerous and life-threatening side effects. When Pfizer, Pharmacia, , and Searle made the representations, it knew them to be false, and said representations were made by Pfizer, Pharmacia, , and Searle with the intent to deceive plaintiffs and/or his prescribing physicians and with the intent to induce plaintiffs to use the Bextra (Valdecoxib) manufactured by Pfizer, Pharmacia, , and Searle.

144.     Plaintiffs and/or her physicians, reasonably relied upon false representations and omissions; plaintiffs' physicians prescribed Bextra (Valdecoxib), and Plaintiffs used Bextra (Valdecoxib).  Plaintiffs would not have done so if he had known the true facts.  In using Bextra (Valdecoxib), plaintiffs exercised ordinary care.

145.     As a direct and proximate result of the aforesaid fraudulent conduct, Pfizer, Pharmacia, , and Searle caused plaintiffs to suffer the damages and injuries herein alleged:

146. Pfizer, Pharmacia, , and Searle's conduct was outrageous due to its evil motive or reckless indifference to the rights of plaintiffs, justifying an award of punitive damages.

## COUNT XV

## BREACH OF IMPLIED WARRANTY

Come now plaintiffs and for Count XV of her Complaint against defendants Pfizer, Pharmacia, , and Searle, allege:

147. Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if fully set forth herein.

148. When Pfizer, Pharmacia, , and Searle placed the Bextra (Valdecoxib) into the stream of commerce, Pfizer, Pharmacia, , and Searle knew of the use for which the drug was intended and impliedly warranted to consumers including plaintiffs that the use of Bextra (Valdecoxib) was a safe and acceptable means of relieving pain and impliedly warranted that the product was of merchantable quality and safe for its intended use.

149. Plaintiffs relied upon Pfizer, Pharmacia, , and Searle and its judgment when his purchased and utilized Bextra (Valdecoxib).

150. The Bextra (Valdecoxib) was not of merchantable quality and was not safe or fit for its intended use because it was unreasonably dangerous and incapable of satisfying the ordinary purpose for which it was intended, and because it caused serious injury to plaintiffs.

151. As a direct and proximate result of the dangerous and defective condition of Bextra (Valdecoxib), plaintiffs were injured, and they incurred economic damages in the form of medical expense.

152.     Plaintiffs are entitled to recover from Pfizer, Pharmacia, , and Searle for all damages caused by the defective product including, but not limited to, damages for pain, suffering, loss of the capacity to enjoy life, lost past and future income and incurred expense.

## COUNT XVI

## BREACH OF EXPRESS WARRANTY

Come now plaintiffs and for Count XVI of her Complaint against defendants Pfizer, Pharmacia, , and Searle and allege:

153.     Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if fully set forth herein.

154.     Pfizer, Pharmacia, , and Searle expressly warranted to plaintiffs by statements made by Pfizer, Pharmacia, , and Searle or its authorized agents, orally or in written publications, package labels, and/or inserts, that Bextra (Valdecoxib) was safe, effective, fit, and proper for its intended use. The express warranties include, but were not limited to:

> a.  Bextra (Valdecoxib) is used in adults for: a. for relief of the signs and
> symptoms of osteoarthritis and adult rheumatoid arthritis: and
>
> b. for the treatment of primary dysmenorrhea.

155.     In utilizing Bextra (Valdecoxib), plaintiffs relied upon the skill, judgment, representations, and express warranties of Pfizer, Pharmacia, , and Searle.

156.     The express warranties and representations made by Pfizer, Pharmacia, , and Searle were false in that Bextra (Valdecoxib) was not safe and was not fit for the use for which it was intended.

157.    As a direct and proximate result of the dangerous and defective condition of Bextra (Valdecoxib), plaintiffs were injured, and they incurred economic damages in the form of medical expense.

158.    Plaintiffs are entitled to recover from Pfizer, Pharmacia, , and Searle for all damages caused by the defective product including, but not limited to, damages for pain, suffering, loss of the capacity to enjoy life, lost past and future income and incurred expense.

**COUNT XVII**

**NEGLIGENT MISREPRESENTATION**

Come now plaintiffs and for Count XVII of her Complaint against defendants Pfizer, Pharmacia, , and Searle, allege:

159.    Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if fully set forth herein.

160.    Pfizer, Pharmacia, , and Searle knew, or should have known, that there were dangerous side effects resulting from the ingestion of Bextra (Valdecoxib).

161.    Pfizer, Pharmacia, , and Searle knew or reasonably should have known that consumers such as plaintiffs would not have known about the increased risk of heart attack and strokes associated with the ingestion of Bextra (Valdecoxib).

162.    Pfizer, Pharmacia, , and Searle armed with the knowledge stated in the preceding two paragraphs, proceeded with the design, production, manufacture, promotion, advertising, and sale of Bextra (Valdecoxib) without adequate warning of the side effects and dangerous risks to the consuming public including plaintiffs.

480247 / 004128

36

163.     Pfizer, Pharmacia, , and Searle negligently represented to plaintiffs the safety and effectiveness of Bextra (Valdecoxib) and concealed material information, including adverse information regarding the safety and effectiveness of Bextra (Valdecoxib). The misrepresentations and/or material omissions made by or perpetuated by Pfizer, Pharmacia, , and Searle are as follows, Pfizer, Pharmacia, , and Searle failed to:

   a.     Conduct sufficient testing which, if properly performed, would have shown that Bextra (Valdecoxib) had serious side effects, including heart attacks, strokes, hypertension, atherosclerosis, blood clots, and other serious side effects, and warn users of those risks; and/or

   b.     Include adequate warnings with Bextra (Valdecoxib) products that would alert users to the potential risks and serious side effects the drugs as well as the limited benefits and the approved uses; and/or

   c.     Warn the plaintiffs that use of Bextra (Valdecoxib) carried a risk of death or permanent disability from heart attacks, strokes, blood clots, other cardiovascular disorders and other serious side effects; and/or

   d.     Advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Bextra (Valdecoxib); and/or

   e.     Provide plaintiffs with other appropriate warnings, including but not limited to that Bextra is not approved for acute pain, it had no proven gastrointestinal-protective effects, it should not be used indefinitely, and patients had to be adequately screened prior to taking Bextra.

164.    Pfizer, Pharmacia, , and Searle made the misrepresentations and omissions with the intent for plaintiffs the consuming public to rely upon such information or the absence of such information in selection of Bextra (Valdecoxib) as a treatment for pain relief.

165.    Plaintiffs justifiably relied on and/or was induced by the misrepresentations and/or active concealment by Pfizer, Pharmacia, , and Searle and he relied upon the absence of safety information which Pfizer, Pharmacia, , and Searle suppressed, concealed, or failed to disclose all to plaintiffs' detriment.

166.    As a direct and proximate result of the dangerous and defective condition of Bextra (Valdecoxib) plaintiffs were injured, and they incurred economic damages in the form of medical expense.

167.    Plaintiffs are entitled to recover from Pfizer, Pharmacia, , Searle for all damages caused by the defective product including, but not limited to, damages for pain, suffering, loss of the capacity to enjoy life, lost past and future income and occurred expense.

WHEREFORE, each plaintiff demands judgments in their favor against defendants Merck, Pharmacia, Searle, and Pfizer, jointly, severally and for common liability for:

A.  A fair and just amount of actual damages in an amount to be proved at trial that exceeds the jurisdictional amount of this Court;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter defendants and others from engaging in the wrongful conduct; and

E.  Such other and further relief as the Court deems just and proper under the

circumstances.


JEFFREY J. LOWE, PC


By: _____

Jeffrey J. Lowe          #10538
Francis J. "Casey" Flynn #118147
Attorney for Plaintiff
8235 Forsyth, Suite 1100
St. Louis, Missouri 63105
(314) 678-3400
Fax: (314) 678-3401

John Carey
Joseph P. Danis
David Bauman
Sarah Hale
CAREY & DANIS, LLC
8235 Forsyth Boulevard, Suite 1100
St. Louis MO 63105
Telephone: 314-725-7700
Facsimile: 314-721-0905

Charles Lampin
Kell Lampin LLC
4700 Mexican Rd.
St. Peters, Missouri 63376
636-498-4000

T. Evan Schaeffer
Andrea B. Lamere
SCHAEFFER & LAMERE, P.C.
5512 Godfrey Road
Highway 67, Suite B
Godfrey, IL 62035
618-467-8200

Evan Buxner

Walther Glenn Law Offices
10 S. Brentwood Blvd., Suite 102
St. Louis, MO 63105
314-725-9595
Fax: 314-725-9597

480247 / 004128